## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JENNIFER L. WILLIAMS,** | : | **CIVIL ACTION NO. 3:13-CV-2158** |
| | : | |
| **Plaintiff** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **CAROLYN W. COLVIN, ACTING** | : | |
| **COMMISSIONER OF SOCIAL** | : | |
| **SECURITY** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM

### Introduction

Plaintiff Jennifer L. Williams has filed this action seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Williams' claim for supplemental security income benefits.

Williams protectively filed her application for supplemental security income benefits on December 31, 2009, alleging that she became disabled on November 1, 2009.  Tr. 12, 151.[1]  Williams has been diagnosed with generalized seizure disorder, adjustment disorder, and Hepatitis C (dormant).  Tr. 14.  On November 22, 2010, Williams' application was initially denied by the Bureau of Disability Determination.  Tr. 126.

---

[1] References to "Tr._" are to pages of the administrative record filed by the Defendant as part of the Defendant's Answer.

A hearing was conducted by an administrative law judge ("ALJ") on February 6, 2012, where Williams was represented by counsel. Tr. 27-82. On March 22, 2012, the ALJ issued a decision denying Williams' application. Tr. 12-21. On June 12, 2013, the Appeals Council declined to grant review. Tr. 1. Williams filed a complaint before this Court on August 14, 2013, and this case became ripe for disposition on February 21, 2014, when Williams declined to file a reply brief.

Williams appeals the ALJ's determination on four grounds: (1) the ALJ erred in failing to address all relevant medical diagnoses, (2) the ALJ improperly applied her lay interpretation to the relevant medical facts, (3) the ALJ improperly discounted Williams' credibility, and (4) the ALJ misapplied the vocational rules at step five. For the reasons set forth below, the decision of the Commissioner is affirmed.

## Statement of Relevant Facts

Williams was thirty-three years of age at the time the ALJ rendered her decision; she has a high school education and is able to read, write, speak and understand the English language. Tr. 33-34, 163. Williams has past relevant work experience as a certified nurse's assistant, which is classified as medium, semi-skilled work. Tr. 77. Williams had further experience as a fast food worker, a restaurant hostess, and a line cook, all of which are light, semi-skilled work. Id.

She also has experience as a waitress and bartender, both of which are medium, semi-skilled work.  Id.

### A.      Williams' Medical History

Williams was involved in a serious motor vehicle accident in 1990; this accident resulted in several broken bones throughout Williams' body.  Tr. 47.  In 1996, Williams fell off a cliff and broke her left ankle, resulting in the placement of several metal pins in her ankle.  Tr. 48-49.

In the year prior to her alleged onset date, Williams twice presented to the emergency room with complaints of ankle or leg pain.  Tr. 364-69, 588-97.  On August 28, 2008, despite complaining of severe left ankle pain, Williams "went in and out of the office, hopped up and down off the exam table easily [and] without hesitation or limp."  Tr. 364.  A physical examination revealed that Williams had a full range of motion in her ankle, no swelling or deformity, normal muscle mass, and no tenderness.  Id.  Williams also had a normal gait pattern.  Id.  The physician on duty, David Kolessar, M.D., expressed concerns about "narcotic addiction" and stressed that Williams' reported pain was "atypical considering her examination and radiographs."  Tr. 365. Dr. Kolessar refused to provide Williams with narcotic pain medication.  Id.

On October 2, 2009, Williams presented to the Geisinger Medical Center emergency room after suffering an apparent seizure.  Tr. 231.  While being

discharged, Williams suffered a second seizure in front of the medical staff.  Tr. 232.  Williams denied any prior seizures, but her family reported a history of seizures and stated that Williams was "probably abusing medications."  Tr. 234.  A physical inspection revealed that Williams had a normal gait, normal heel-to-toe walking, normal and symmetric reflexes, and normal coordination.  Tr. 237.  She also had normal strength in her lower extremities.  Tr. 248.

An EEG study was performed which revealed mild abnormalities "without epileptiform features."  Tr. 240.  A CT scan of the head revealed "no acute intracranial abnormalities."  Tr. 245.  Williams initially denied abusing prescription medications, but later admitted to taking a "'benzo' a couple of weeks" prior to her hospitalization.  Tr. 242.  A drug screen was positive for the presence of benzodiazepines.  Tr. 232.  Williams was diagnosed with seizure disorder and possible benzodiazepine withdrawal.  Tr. 231, 245.

On December 8, 2009, Williams presented to Mitchell Gross, M.D. for a neurological consultation.  Tr. 271.  Williams reported two recent seizures,[2] both of which resulted in decorticate posturing, cyanosis, and confusion afterwards.  Id.  Dr. Gross noted that these seizures occurred the day after he had reduced Williams' Keppra prescription.  Id.  Williams appeared drowsy at the appointment

---

[2] Williams had presented to the emergency room on December 4, 2009 following these seizures. Tr. 522-25.  At that time, another toxicology screen revealed the presence of benzodiazepines. Tr. 524.

and engaged in "inappropriate conversation." Id. Dr. Gross diagnosed Williams

with possible seizures and chronic pain, and increased her dose of Keppra. Tr.

272-73.

An EEG test was performed on December 10, 2009. Tr. 277. This test was

mildly abnormal, and was suggestive of a "mild disturbance of cerebral function in

the central temporal region[.]" Id. An MRI of the brain was conducted on

December 14, 2009; this MRI was "essentially normal." Tr. 281-82.

On March 22, 2010, Williams returned to Dr. Gross for a follow-up

examination. Tr. 284. Williams reported that she was doing better since her dose

of Keppra had been increased and had not suffered from a seizure since December

2009. Id. Williams was alert and oriented, and "more appropriate than in previous

visits but still [had] a bit [of an] odd affect." Id. Williams complained that she

was bothered by chronic leg pain. Tr. 285.

On July 14, 2010, Williams was examined by Athar Altaf, M.D. Tr. 430.

Williams' gait was normal, as was her coordination. Id. Williams reported that

she had "[n]o current health issues;" her depression was under control, and she had

not had a seizure in half a year. Id.

On August 26, 2010, Williams reported to the emergency room with

complaints of a "change" in mental status. Tr. 517. Williams reported that she had

not had a seizure since December 2009, but admitted that she was taking more

Keppra than she had been prescribed.  Id.  A toxicology screen was again positive

for benzodiazepines.  Tr. 520.  Williams was diagnosed with a possible subclinical

seizure.  Tr. 521.

On August 28, 2010, Williams returned to the emergency room after

suffering from a seizure.  Tr. 512.  Williams reported that she had discontinued

"her Keppra within the past few days because she claim[ed] it . . . was increasing

her daytime drowsiness and felt that it was not working for her."  Id.  A physical

examination of Williams' extremities was normal and she had no weakness in her

extremities.  Tr. 514.  Williams was diagnosed with a generalized seizure.  Tr. 515.

On September 2, 2010, Williams again presented to the emergency room

after suffering from a seizure that included shaking and a loss of consciousness.

Tr. 507.  Williams was diagnosed with a tonic-clonic seizure, and her dose of

Keppra was increased.  Tr. 510.

On October 1, 2010, Williams was brought to the emergency room

following another seizure.  Tr. 502.  Williams reported that she had "been anxious

recently" and believed this contributed to her seizure.  Id.  Her extremities were

normal on examination, and she was ambulatory and in no distress upon discharge.

Tr. 504-05.  Williams was diagnosed with an anxiety attack, although a seizure

could not be ruled out.  Tr. 505.

On August 15, 2011, Williams presented to Dr. Gross for a neurological examination.  Tr. 453.  At this appointment, Williams reported that she was taking methadone for chronic pain and was attending community college.  Id.  Williams stated that her last seizure had been in November 2010, and believed the seizure had been related to sleep deprivation.  Id.  Williams reported pain in her lower extremities and had a "minimally antalgic" gait.  Tr. 453, 455.

On October 3, 2011, Williams reported to the emergency room after hurting her ankle in a fall.  Tr. 500.  X-rays were normal and the physician on duty, Todd Holmes, M.D., opined that there did not "appear to be a substantial injury."  Tr. 500, 565.  Williams denied using methadone until Dr. Holmes pointed out that Williams' medical records referenced methadone use.  Tr. 500.  At that point, Williams stated that she had not used methadone since August 2010 and admitted that she had been on methadone for her heroin addiction, as well as for chronic pain.  Id.  Dr. Holmes refused to prescribe narcotic medication.  Id.

On October 5, 2011, Williams was admitted to the emergency for an "altered mental state;" her family stated that Williams appeared confused at times.  Tr. 475, 480.  Williams was "completely oriented" but "a little bit slow to respond."  Tr. 475.  Williams admitted to past heroin and cocaine use, but stated that she had not used drugs in over one year.  Id.  Williams reported needing help with routine activities such as walking and showering due to weakness in her extremities.  Id.

She also reported a history of atrophy in her frontal lobe as a result of her childhood motor vehicle accident.  Tr. 480.  Lihua Zhou, a physician's assistant, diagnosed Williams with traumatic brain injury.  Tr. 474.

Ronald Strony, Jr., M.D. noted that Williams had stuttering, inconsistent speech, as well as facial and tongue twitching.  Tr. 482.  A toxicology screen was positive for benzodiazepines, and an EEG showed "non-specific encephalopathy, [though] the etiology [was] unclear and possible toxic related."  Tr. 476, 484.  Dr. Strony noted that Williams had been weaned off of methadone after a random drug test came back positive for benzodiazepines.  Tr. 485.  He diagnosed Williams with an "altered mental state" and a history of polysubstance abuse.  Tr. 485-86. Dr. Strony excluded all differential diagnoses, including those relating to any traumatic etiology.  Tr. 482, 486.  Chirag Popat, M.D. noted that Williams had a history of traumatic brain injury.  Tr. 491.

Later that day, Douglas Nathanson, M.D. examined Williams for a neurological consultation.  Tr. 493.  Dr. Nathanson noted that there had not been any "overt seizures similar to those [Williams] had in the past."  Id.  Dr. Nathanson opined that Williams was psychiatrically abnormal, and was inappropriate in her interactions.  Tr. 486.  Williams was able to follow simple commands, but gave "frequent inappropriate responses."  Id.  On physical examination, Williams' reflexes were normal throughout; she had normal coordination and normal motor

8

strength in all extremities.  Id.  Dr. Nathanson diagnosed Williams with

"encephalopathy: most likely toxic/metabolic (suspect the former)."  Tr. 497.  Dr.

Nathanson did not believe that Williams had suffered from a seizure, and opined

that "there may be a behavioral component to [Williams'] presentation."  Id.

### B.    Residual Functional Capacity Assessments

On August 24, 2010 Theodore Waldron, D.O. reviewed Williams' medical

records and completed a physical residual functional capacity assessment.  Tr. 300-

05.  Dr. Waldron diagnosed Williams with seizure disorder, prior head trauma, and

prior lower extremity fractures.  Tr. 305.  Dr. Waldron opined that Williams could

occasionally lift or carry up to twenty pounds and could frequently lift or carry ten

pounds.  Tr. 301.  He believed that Williams could never climb ropes, ladder, or

scaffold, and was limited to only occasional use of ramps and stairs.  Tr. 302.

Furthermore, Williams must avoid concentrated exposure to noise, vibration,

pulmonary irritants, or hazards such as heights or machinery.  Tr. 303.

On November 4, 2010, Jeffrey Fremont, Ph.D. examined Williams and

offered an assessment of functional limitations caused by Williams' mental

impairments.  Tr. 306-14.  Dr. Fremont observed that Williams had some physical

difficulties; she had difficulty ambulating and standing, as well as lifting herself

out of a chair.  Tr. 306.  Williams reported that she had stopped working in 2002

after the bar she worked for had closed.  Id.  She had no difficulty with

mannerisms, though there was some indication of impulsivity.  Tr. 307.  Dr.

Fremont stated that Williams "was cooperative, but not self-sufficient" and

socialized on a minimal basis.  Id.

Williams was alert and oriented, was slightly anxious, and had a depressed

mood and flat affect but denied suicidal ideation.  Tr. 307-08.  She was

cooperative, had impulsive speech, and had some difficulty answering questions

correctly.  Tr. 308.  Dr. Fremont observed a productive thought process with no

loose associations or thought disturbances.  Id.  Williams' speech was slow and her

continuity of thought was fair and goal-directed.  Id.  Williams was able to identify

two out of three paired words and two out of three simple analogies.  Id.  She was

able to "easily" completed serial 2's, 3's, and 7's, and her fund of information was

"quite good."  Id.  Williams' recent and remote memory was intact and she could

recall five unrelated digits forward and in reverse.  Tr. 308.

Dr. Fremont opined that Williams' social judgment was fair and her insight

was poor.  Id.  He diagnosed Williams with "adjustment disorder with depressed

mood" and assigned a GAF score of forty-five.[3]  Tr. 309-10.  Dr. Fremont opined

that there was "no significant mental health diagnosis."  Tr. 310.  Dr. Fremont

stated that Williams' concentrated was "quite poor" and her social functioning was

---

[3] A GAF score of 41-50 is indicative of "serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Diagnostic and Statistical Manual of Mental Disorders,* 34 (4th ed., Text rev., 2000).

"extremely limited." Id.  He believed Williams had a fair ability to: (1) make

occupational adjustments, (2) follow work rules, (3) relate to co-workers, and (4)

make personal social adjustments.  Tr. 310-11.

Dr. Fremont believed Williams had a poor ability to: (1) deal with the

public, (2) "use judgment," (3) interact with supervisors, (4) deal with work stress,

(5) function independently, (6) maintain attention or concentration, (7) understand,

remember, and carry out simple or complex instructions, (8) make performance

adjustments, (9) behave in an emotionally stable manner, and (10) demonstrate

reliability.  Id.

On November 22, 2010, Grant Croyle, Ph.D. reviewed Williams' records

and completed a mental residual functional capacity assessment.  Tr. 316-32.  Dr.

Croyle diagnosed Williams with adjustment disorder with depressed mood and

"chemical abuse by history," but noted that Williams had no past mental

hospitalizations.  Tr. 318.  Dr. Croyle opined that Williams was moderately limited

in her ability to: (1) carry out detailed instructions, (2) maintain attention and

concentration for extended periods, (3) maintain regular attendance, be punctual

within customary tolerances, and perform activities within a schedule, (4) complete

a normal workday or workweek and perform at a consistent pace, (5) interact

appropriate with the general public, (6) get along with co-workers, (7) respond

appropriately to changes in the work setting, and (8) set realistic goals or make plans independently of others.  Tr. 316-17.

Dr. Croyle opined that Williams "can perform simple, routine, repetitive work in a stable environment." Tr. 318.  He believed that Williams was able to make simple decisions and carry out very short and simple instructions.  Id. Despite Williams' "history of difficulty interacting with the general public, [she] had the ability to get along with others in the work place." Id.  Dr. Croyle also believed that Williams was able to maintain socially appropriate behavior and function in "production oriented jobs requiring little independent decision making." Id.  Dr. Croyle opined that Williams did not meet Paragraph B or C criteria for a listing at Step Three of the sequential evaluation process.  Tr. 330-31.

Finally, Dr. Croyle stated that Dr. Fremont's report was not persuasive.  Tr. 318.  Dr. Croyle believed that Dr. Fremont's report "relied heavily on the subjective reports of symptoms and limitations" provided by Williams, "appear[ed] to contain inconsistencies," and was unsupported by the objective medical evidence.  Id.  In that vein, Dr. Croyle noted that Dr. Fremont's "comment on problematic concentration related poorly to findings on intact memory, seriation, [and] calculations." Tr. 332.  Dr. Croyle also believed these findings were "based on an isolated exam and is an overestimate of [Williams'] limitations." Tr. 318.

### C.     The Administrative Hearing

At the administrative hearing, Williams testified that she was limited

primarily by "extreme leg pain," depression, and seizures.  Tr. 37.  Williams also

stated that she had difficulty with her memory.  Tr. 51.  Williams testified that she

often lost consciousness during her seizures, and afterwards felt drowsy and tired.

Tr. 38.  Williams stated that she was taking Keppra for her seizures, and did not

suffer from any side effects from the medication.  Tr. 41-42.  Williams believed

that her seizures were often triggered by stress, anxiety, or a depressed mood, and

stated that she had two or three seizures each week.  Tr. 43, 63.  She was able to

walk or stand for five to ten minutes before she needed to sit down to alleviate pain

in her legs; she generally did not have problems with sitting.  Tr. 44-45.  Much of

Williams' testimony relating to her seizures was repeated during the testimony

provided by her mother, Arelene Williams.  Tr. 63-75.

Williams resided at her mother's home with her twelve year old daughter.

Tr. 33-34.  Williams testified that she had taken classes at a community college for

one semester in 2009, but had not returned since then.  Tr. 42.  She was able to

shop for groceries with her mother, but sometimes had to rest or hold onto the

shopping cart.  Id.  She was able to do chores around the house as long as she took

breaks, but generally spent her time watching television, reading magazines, and

spending time on Facebook.  Tr. 43.  Williams had taken one vacation to New

Jersey since her alleged onset date.  Id.

  After Williams testified, Francis Terry, an impartial vocational expert, was

called to give testimony.  Tr. 76.  The ALJ asked Ms. Terry to assume a

hypothetical individual with Williams' age, education, and work experience who

was limited to light work.[4]  Tr. 77-78.  The hypothetical individual could not

perform detailed or complex tasks, and was limited to simple, routine tasks.  Tr.

78.  The individual was limited to occasional interaction with co-workers and

could only work in a low stress environment, which was defined as occasional

decision making and occasional changes in the work setting.  Id.  The hypothetical

individual could occasionally balance and climb, but could never climb ladders,

ropes, or scaffolds.  Id.  She must avoid concentrated exposure to vibrations,

excessive noise, or pulmonary irritants, and must avoid moderate exposure to

hazards.  Id.  The individual could not drive or be around unprotected heights.  Id.

  Ms. Terry opined that, given these restrictions, the hypothetical individual

would be unable to perform Williams' past relevant work.  Id.  However, the

---

[4] Light Work is defined by the regulations of the Social Security Administration as work "with
frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted
may be very little, a job is in this category when it requires a good deal of walking or standing, or
when it involves sitting most of the time with some pushing and pulling of arm or leg controls.
To be considered capable of performing a full or wide range of light work, you must have the
ability to do substantially all of these activities. If someone can do light work, we determine that
he or she can also do sedentary work, unless there are additional limiting factors such as loss of
fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 416.967.

individual would be capable of performing three jobs that exist in significant
numbers in the national economy: a ticket taker, a cafeteria attendant, and an office
cleaner.  Id.

**Discussion**

In an action under 42 U.S.C. § 405(g) to review the Commissioner's
decision denying a plaintiff's claim for disability benefits, the district court must
uphold the findings of the Commissioner so long as those findings are supported
by substantial evidence.  Substantial evidence "does not mean a large or
considerable amount of evidence, but 'rather such relevant evidence as a
reasonable mind might accept as adequate to support a conclusion.'" Pierce v.
Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v.
N.L.R.B., 305 U.S. 197, 229 (1938)). Substantial evidence has been described as
more than a mere scintilla of evidence but less than a preponderance.  Brown v.
Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).  In an adequately developed record
substantial evidence may be "something less than the weight of the evidence, and
the possibility of drawing two inconsistent conclusions from the evidence does not
prevent an administrative agency's finding from being supported by substantial
evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in
the record," Cotter v. Harris, 642 F.2d 700, 706 (3d Cir. 1981), and "must take into

account whatever in the record fairly detracts from its weight." Universal Camera

Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not

substantial evidence if the Commissioner ignores countervailing evidence or fails

to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058,

1064 (3d Cir. 1993). The Commissioner must indicate which evidence was

accepted, which evidence was rejected, and the reasons for rejecting certain

evidence. Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 203 (3d Cir. 2008).

Therefore, a court reviewing the decision of the Commissioner must scrutinize the

record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

The Commissioner utilizes a five-step process in evaluating disability

insurance benefits claims. See 20 C.F.R. § 404.1520; Poulos v. Comm'r of Soc.

Sec., 474 F.3d 88, 91-92 (3d Cir. 2007). This process requires the Commissioner

to consider, in sequence, whether a claimant (1) is engaging in substantial gainful

activity, (2) has an impairment that is severe or a combination of impairments that

is severe, (3) has an impairment or combination of impairments that meets or

equals the requirements of a listed impairment, (4) has the residual functional

capacity to return to his or her past work and (5) if not, whether he or she can

perform other work in the national economy. See 20 C.F.R. § 404.1520. The

initial burden to prove disability and inability to engage in past relevant work rests

on the claimant; if the claimant meets this burden, the burden then shifts to the

Commissioner to show that a job or jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  <u>Mason</u>, 994 F.2d at 1064.

A.     **The ALJ's Evaluation of Williams' Medical Diagnoses**

On appeal, Williams first argues that the ALJ failed to evaluate all of Williams' medically determinable impairments.  Specifically, Williams argues that the ALJ failed to account for her diagnoses of chronic pain, depression, anxiety attacks, and traumatic brain injury.  Additionally, Williams argues that the ALJ failed to account for the diagnoses provided by Dr. Waldron.

An ALJ must evaluate all impairments, both severe and non-severe at Step Four of the sequential evaluation process; failure to evaluate a severe impairment constitutes reversible error.  <u>See</u>, <u>e.g.</u>, <u>Shannon v. Astrue</u>, 4:11-CV-00289, 2012 WL 1205816, at *10 (M.D. Pa. April 11, 2012); <u>Bell v. Colvin</u>, 3:12-CV-00634, 2013 WL 6835408, at *8 (M.D. Pa. Dec. 23, 2013); <u>Stape v. Colvin</u>, Civil No. 3:13-CV-02308, 2014 WL 1452977, at *6 (M.D. Pa. April 14, 2014); <u>Jorich v. Colvin</u>, 3:12-CV-01627, 2014 WL 2462963, at *9 (M.D. Pa. May 29, 2014).

Several medical records note that Williams suffered from chronic pain.  Tr. 290, 499.  However, pain is a symptom of an underlying impairment, and is not itself a medically determinable impairment; therefore, the ALJ did not err in her treatment of the medical records concerning chronic pain.  <u>See</u>, SSR 96-4p

(Providing that "[n]o symptom or combination of symptoms by itself can constitute a medical determinable impairment" and "an individual's symptoms, such as pain . . . will not be found to affect the individual's ability to . . . work" unless substantiated by the existence of a medically determinable impairment).  See also, Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 122 ("allegations of pain and other subjective symptoms must be consistent with objective medical evidence").

Furthermore, contrary to Williams' contention, she was never diagnosed with depression.  Rather, two doctors noted that Williams had a "depressed mood,"[5] which is a symptom, not a medically determinable impairment.  See, Najmi-Nejad v. Barnhart, 75 F.App'x 60, 63 (3d Cir. 2003) (listing a depressed mood as a symptom of depression).  See also, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed., Text rev., 2000) (listing depressed mood as a symptom).  Similarly, an anxiety attack is a symptom, and not an impairment.  E.g., Seabon v. Comm'r of Soc. Sec., CIV.A. 10-2268, 2011 WL 3425508, at *10 (D.N.J. Aug. 4, 2011).  Consequently, the ALJ did not err in failing to address diagnoses of a depressed mood and anxiety attack.

The ALJ did not err in failing to address a diagnosis of traumatic brain injury.  Social Security regulations require evidence from an acceptable medical source to establish any medically determinable impairment.  20 C.F.R. §

_____

[5] One physician did note depression in his treatment notes; this was not a diagnosis, but a notation of Williams' subjective statements.  Tr. 430.

404.1513(a).  A physician's assistant is not an acceptable medical source, but is

considered an "other source" under the Social Security Administration regulations.

20 C.F.R. § 404.1513(d)(1).  "Information from these 'other sources' cannot

establish the existence of a medically determinable impairment."  SSR 06-03p.

Here, the only diagnosis of traumatic brain injury that is contained within the

administrative record came from Lihua Zou, a physician's assistant.  Tr. 474.  Ms.

Zou is considered an "other source" under the Social Security Administration's

regulations, and therefore her opinion alone is insufficient to establish traumatic

brain injury as a medically determinable impairment.

A diagnosis of traumatic brain injury was not supported by any of the

physicians who examined Williams.  Dr. Popat did not diagnose Williams with

traumatic brain injury, but rather noted that she reported a history of traumatic

brain injury.  Tr. 491.  A claimant must establish that a medically determinable

impairment affects his or her functioning during the relevant period, and simply

having a past history of impairment does not establish that the impairment is

relevant to the claimant's case.  See, 20 C.F.R. § 404.1512(c).

Additionally, Dr. Strony specifically excluded any diagnosis relating to a

traumatic etiology.  Tr. 482, 486.  Dr. Nathanson, a neurologist, opined that

Williams' symptoms were likely caused by toxicity, not by traumatic brain injury.

Tr. 497.  Williams did not seek any medical treatment for traumatic brain injury,

and an MRI scan of her brain revealed no abnormalities.  Tr. 282.  Consequently,

Williams did not establish that traumatic brain injury was a medically determinable

impairment, and the ALJ did not err in failing to address that diagnosis.

Finally, though Dr. Waldron did diagnose Williams with a past history of

head trauma and lower extremity fractures, tr. 305, as previously discussed a past

history does not establish the existence of a relevant medical impairment.

Therefore, the ALJ did not err in failing to note Dr. Waldron's diagnoses.

B.     **The ALJ's Review of the Available Medical Evidence**

Williams also argues that the ALJ's conclusions regarding her methadone

use and Keppra use were unjustified and contrary to the administrative record.  The

ALJ noted that Williams had a past history of drug abuse and was taking

methadone due to past drug use.  Tr. 17.  Williams argues that this was a "clear

misstatement of the evidence" because she was actually taking methadone for

chronic pain.  A thorough reading of the administrative record reveals that the

ALJ's statement was not erroneous.  At a treatment session with Dr. Holmes,

Williams initially denied ever taking methadone.  Tr. 500.  However, after Dr.

Holmes pointed out that medical records confirmed Williams' use of methadone,

she admitted that she used methadone at least partially due to past heroin use.  Id.

Thus, the administrative record lends support to the ALJ's conclusion.

The ALJ also did not mischaracterize evidence related to Williams' use of Keppra.  The ALJ noted that Keppra helped control Williams' seizures and many of her seizures were due to overmedication, non-compliance with medication, or "panic."  Tr. 18.  In that vein, after Dr. Gross increased Williams' dose of Keppra, she reported "doing better" and did not have any seizures for a period of eight months.  Tr. 284.  The next time Williams presented to the emergency room with a possible seizure was on August 26, 2010.  Tr. 517.  At that visit, Williams admitted that she was taking more Keppra than she had been prescribed.  Id.  Williams' next seizure occurred only days after she stopped taking her prescribed Keppra.  Tr. 512.  The ALJ reviewed and cited to the relevant evidence contained within the administrative record, and her conclusions regarding Williams' use of methadone and Keppra were supported by substantial evidence.

### C.    Evaluation of Williams' Credibility

Williams next contends that the ALJ erred in her credibility determination.  Specifically, Williams argues that the ALJ erred in relying upon Williams' activities of daily living in finding her less than credible, erred in failing to account for all of her medically determinable impairments, and erred by failing to account for Williams' stated need to use a cane for ambulation.

If allegations of pain and other subjective symptoms are supported by objective medical evidence, an ALJ must "determine the extent to which a

claimant is accurately stating the degree" of the subjective symptoms.  Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999) (citing 20 C.F.R. § 404.1529(c)).  An ALJ's credibility determination is entitled to deference by a district court because "he or she has the opportunity at a hearing to assess a witness's demeanor."  Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003).

Though the ALJ did cite to Williams' reported activities of daily living as one reason for finding Williams less than credible, this was not the only reason relied upon by the ALJ.  Tr. 17, 19.  The ALJ noted that Williams testified that she had only attended one semester of community college in 2009.  Tr. 17.  However, the ALJ found that this statement was contradicted by medical records indicating that Williams had returned to community college in 2011.  Tr. 17, 453.  The ALJ found that Williams' credibility was further diminished by her statement that she had not taken any drugs since being weaned off methadone.  Tr. 17.  The ALJ noted that Williams had been weaned off methadone after testing positive for benzodiazepines.  Id.  Williams had tested positive for benzodiazepines even after being weaned off of methadone.  Tr. 484.

The ALJ also noted that, despite Williams' claims of severe mental impairments, she had not sought any treatment for these impairments.  Tr. 18.  Substantial evidence in the administrative record supports the ALJ's credibility determination.  There is no basis upon which to disturb the ALJ's determination,

22

particularly in light of the deference that is properly owed to an ALJ's credibility

determination.

Finally, the ALJ did not err in failing to consider Williams' purported use of

a cane for ambulation.  While Williams did testify that she required the use of a

cane, the ALJ was not required to accommodate such use in the residual functional

capacity determination.  Tr. 16, 44.  Social Security regulations provide that an

ALJ will not accommodate the use of a cane unless the claimant first provides

"medical documentation establishing the need for a hand-held assistive device to

aid in walking or standing, and describing the circumstances for which it is

needed[.]"  SSR 96-9p.  Absent such documentation, an ALJ need not

accommodate the use of a cane in a residual functional capacity assessment, even

if the claimant was prescribed a cane by a doctor.  See, Howze v. Barnhart, 53

F.App'x 218, 222 (3d Cir. 2002).

Here, Williams has not provided any medical documentation relating to the

medical necessity of a cane, nor is there a single mention in the medical records

that Williams used a cane.  In the absent of such evidence, the ALJ did not err in

failing to include the use of a cane in Williams' residual functional capacity.

D.     **Application of the Vocational Rules**

Lastly, Williams argues that the ALJ erred by not accepting the vocational

expert's testimony.  In response to a hypothetical questions posed by the ALJ, the

vocational expert testified that an individual would be effectively disabled if she required unscheduled breaks throughout the workday or missed more than two days of work per month.  Tr. 79.

A "vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the [ALJ's hypothetical] question accurately portrays the claimant's individual physical and mental" limitations.  Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984). However, the hypothetical question need not convey every alleged impairment; the hypothetical question must convey only "a claimant's *credibly established limitations*."  Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005) (emphasis in original).  Furthermore, the ALJ does not need to accept the testimony of a vocational expert where that testimony is based upon subjective complaints that the ALJ has deemed non-credible.  See, Craigie v. Bowen, 835 F.2d 56, 57-58 (3d Cir. 1987).

Here, the ALJ incorporated all of Williams' credibly established limitations into the residual functional capacity determination.  Tr. 16.  These limitations were accurately conveyed to the vocational expert.  Tr. 77-78.  While the vocational expert did testify that an individual would effectively be disabled if she missed more than two days of work each month or required unscheduled breaks, the ALJ rejected these limitations by finding that Williams was less than credible.  Tr. 17.

Consequently, the vocational expert's testimony constitutes substantial evidence supporting the ALJ's determination at Step Five.

**<u>Conclusion</u>**

A review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence.  Pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner affirmed.

An appropriate Order will be entered.

  /s/ Christopher C. Conner
CHRISTOPHER C. CONNER
Chief Judge, Middle District of Pennsylvania

Dated:       September 30, 2014